**In the Matter of Theodore V. OLSON, Debtor.**

**OVERLAND NATIONAL BANK OF GRAND ISLAND, Plaintiff,**

**v.**

**Theodore V. OLSON, et al, Defendant.**

**Bankruptcy Nos. BK85–1085, A85–181.**

United States Bankruptcy Court, D. Nebraska.

June 3, 1988.

See also, Bkrtcy., 101 B.R. 134.

Loren Mark, Tax Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Robert Creager of Berry, Anderson, Creager & Willstruck, P.C., Lincoln, Neb., for debtor.

Richard Anderl of Kutak, Rock & Campbell, Omaha, Neb., for Prudential Ins. Co. of America.

Frank Heinish, Geneva, Neb., and William Needler, Chicago, Ill., for creditors.

## MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

Evidentiary hearing was held on March 9, 1988, concerning the liability of debtor, Theodore V. Olson, to the United States through the Internal Revenue Service for an assessment pursuant to 26 U.S.C. § 6672 in the amount of $184,220.96. Robert Creager of Berry, Anderson, Creager & Wittstruck, P.C., Lincoln, Nebraska, appeared on behalf of the debtor; Frank Heinish of Geneva, Nebraska, and William Needler of Chicago, Illinois, appeared on behalf of creditors. Loren Mark of the Tax Division, U.S. Department of Justice, Washington, D.C., appeared on behalf of the United States. Richard Anderl of Kutak, Rock & Campbell, Omaha, Nebraska, appeared on behalf of Prudential Insurance Company of America.

The parties agreed and the Court finds that this matter is a core proceeding under 28 U.S.C. § 157. The parties and the Court agree that there is a second part of this case which will need to be tried no matter what this Court decides on the tax issue. Therefore, the appeal rights of all parties are preserved until a final order is filed concerning all issues in the case. This Memorandum constitutes findings of fact and conclusions of law pursuant to F.R. C.P. 52 and Bankruptcy Rule 7052.

Theodore V. Olson, the debtor, hereinafter referred to as Mr. Olson, was the president and sole shareholder of Olson Brothers Manufacturing Company, an entity that manufactured and marketed center pivot irrigation systems throughout the United States during the late 1960's, 1970's and into the early 1980's. The Company was a major factor in the industry in the later 1970's and was a major consumer of credit through long-term and short-term agreements with various lending institutions.

In January of 1980, Olson Brothers Manufacturing Company (the Company) entered into a new financial arrangement with Wells Fargo Business Credit by which the Company was extended loan proceeds on the basis of a formula which included a lending relationship based upon a percentage of outstanding current receivables. The lender and the Company considered the lending relationship to be a "receivables financing" arrangement. This arrangement required the Company to keep the lender informed on a regular basis, sometimes daily, of the status of all receivables and the amount of loan proceeds available to the Company depended upon the amount and age of the receivables. In addition to receivables, the Company granted the financial institution a security interest in all of its personal property, i.e., inventory and equipment and machinery.

In the spring of 1980, the Company began having serious cash-flow problems. One or more of its major receivables became seriously delinquent which caused the lender to reduce the amount of funds available to the Company for operating purposes. The cash flow matters became so serious that the lender placed its own personnel on the site of the manufacturing plant and offices to monitor the daily sales, expenditures and receipts, as well as receivables.

Mr. Olson was president and chief operating officer of the business. He concentrated his efforts prior to the spring of 1980 on the sales of the product. He appointed other officers and employees to supervise the manufacturing process and

the financial side of the business. These various managers had subordinate employees who were responsible for the day-to-day operation of the business, including the physical activities of making bank deposits, writing checks, paying the payroll on a timely basis, and paying the various federal and state taxes related to payroll matters.

For the calendar quarters ending June 30, 1980, September 30, 1980, and December 31, 1980, the Company failed to pay over to the Internal Revenue Service all of the withheld income and social security taxes from wages paid to its employees. In addition, it failed to pay over to the Internal Revenue Service the corporate matching obligation with regard to the social security taxes. For purposes of this opinion, all of those taxes are identified as "trust fund taxes."

The Company eventually filed for bankruptcy and was liquidated with no additional payments of the trust fund taxes being made for the quarters in question.

In 1983 the Secretary of the Treasury made an assessment pursuant to 26 U.S.C. § 6672 and gave notice of the assessment and demand for payment against Theodore V. Olson. The assessment, in the amount of $184,220.96, was based on a determination by the United States that: (1) Theodore V. Olson was a person responsible for paying to the United States the withholding and Federal Insurance Contributions Act (FICA) taxes of the Company for the calendar quarters ending June 30, 1980, September 30, 1980, and December 31, 1980; and, (2) Mr. Olson had knowledge of or recklessly disregarded the fact that these taxes had not been paid.

Mr. Olson, during the quarters in question, was the president and chief operating officer of the Company. At least until early December of 1980 when the Company filed for protection under Chapter 11 of the Bankruptcy Code, he had full authority to hire and fire employees; execute loan documents on behalf of the Company without permission of any other person or entity; sign checks on the Company accounts on behalf of the Company without any countersignatures required; price the products manufactured by the Company; determine the necessary inventory amounts; the types of inventory required and the number of units to be manufactured; determine the appropriate delivery schedules; determine the marketing strategy of the Company; and, subject only to the availability of funds, determine which creditor should be paid and how much each creditor should be paid and on what date each creditor should be paid.

Mr. Olson testified at length that from late June of 1980 through the end of the year 1980 the operating lender, Wells Fargo Business Credit, so closely supervised the activities of the Company that he believed he had no control over management decisions concerning accounts payable, including but not limited to payment of trust fund taxes.

However, this Court finds that the lender, although placing monitoring employees on the premises of the Company, did not take over the management of the Company in general. The lender did not have power to nor attempt to exercise the power of hiring or firing. The lender did not determine the appropriate level of sales activity, the advertising or marketing strategies, the number of personnel needed for operations, nor did the lender make any decisions with regard to the payment of payroll or trust fund taxes, other than to provide funds for payroll when specifically requested. The Company, although under pressure from the lender with regard to collection of receivables and with regard to the amount of money that the lender would make available for paying ordinary and necessary business expenses, had, at all times relevant to this issue, the absolute power to make all management determinations and the lender was not in control of any aspect of the Company.

There is no evidence that during the quarter ending June 30, 1980, or the quarter ending September 30, 1980, that the lender refused to provide operating funds to the Company for use by the Company in paying accounts payable or payroll. Although there is evidence that the lender was providing funds during a portion of

the second and third quarters of 1980 only for specific inventory purchases and payroll, there is no evidence that funds were denied the Company for payroll. The Court finds that during the quarter ending June 30, 1980, and September 30, 1980, the lender did provide gross payroll amounts as requested by the Company, which would include, trust fund taxes.

The Court finds as a fact that Mr. Olson became aware that the trust fund taxes were not being paid during the month of August, 1980. Although the evidence is in conflict, most of the conflict is in his memory. At one point he has testified that he became aware of the lack of payment of taxes in October of 1980. At another point he acknowledged that he was aware of the failure to pay the trust fund taxes in September of 1980 and yet another point he stated that he probably knew about it in August of 1980. This Court finds that he was aware that the Company was having cash flow problems from June of 1980 forward. The Court further finds that he was aware that the trust fund taxes were not being paid on a regular basis by the required weekly deposits sometime in the month of August, 1980. This finding coincides with the fact that the employer's quarterly federal tax return for the quarter ending September 30, 1980, and December 31, 1980, (Form 941), show that no deposits of trust fund taxes were made from the last week of July through the third week of December.

The employer's quarterly federal tax return (Form 941) filed for the quarter ending June 30, 1980, shows that the appropriate deposits were made by the Company on a timely basis and that all trust fund taxes that were due and payable were paid. However, the evidence presented at the trial shows that a check in the amount of $13,061.56 deposited July 30, 1980, was returned for insufficient funds. Therefore, when the Internal Revenue Service assessed Mr. Olson, the Internal Revenue Service included at least $13,061.56 as his responsibility. However, this Court finds as a fact that Mr. Olson was not aware that the check had been returned for insufficient funds and was not aware until he was

assessed that there was any amount unpaid for the quarter ending June 30, 1980. There was no evidence presented by the Internal Revenue Service as to whether or not notice had been provided to the Company or to Mr. Olson prior to the date of the assessment that any amount was due for the quarter ending June 30, 1980, and if so, how much and for what reason. Mr. Olson testified that he was unaware until he was assessed that there were any funds owing for the quarter ending June 30, 1980.

From late June, 1980, through the end of December, 1980, the Company was in an "over advance" position with regard to its financing arrangements. This means that according to the formula under which the lender provided funds, the value of the collateral (receivables) had declined, mainly as a result of age, to such an extent that the amount of money that had been loaned to the Company was in excess of the amount which should have been loaned pursuant to the formula agreed upon between the parties. The amount of over advance was approximately $392,000. As a result of this over advance, the lender refused to provide additional operating funds except on a special request basis and the Company would have to justify the purpose and use of the funds.

Because the lender refused to make operating funds available, the Company was unable to pay its account payables on a timely basis and many suppliers put the Company on a cash basis, meaning that materials would not be supplied unless payment was made in cash. In addition, because funds were not available to obtain parts and materials necessary to complete the irrigation systems, several systems were shipped to dealers without all of the parts. Sometimes tires or wheels were missing and sometimes gear boxes and other significant parts were missing. This resulted in dealers refusing to pay for the irrigation equipment. Therefore, in order to encourage dealers to pay for the equipment and for part suppliers to provide parts, the lender agreed on certain occasions to make specific advances which the Company agreed to use to purchase specif-

ic parts. All parties hoped that the completion of the unit would permit payment of receivables which would be able to be applied on the outstanding balance, get the Company back in a positive cash flow situation and permit the lender to make further advances.

In addition to making specific advances for specific purposes, the lender provided, at least through early December, advances for payroll. An officer of the lender testified by deposition that payroll advances were requested and that advances were made. All advances would have been made in the amount requested, which the lender assumed included trust fund tax amount.

Since there is evidence, basically uncontradicted, that gross payroll funds were made available to the Company but trust fund taxes were not paid for the quarters ending September 30, 1980, and prebankruptcy petition pay periods in the quarter ending December 31, 1980, the Company must have used the funds which should have been earmarked as trust fund taxes, for payment of other operating expenses.

Mr. Olson has argued that he had a firm belief that he was not authorized to use any lender funds for any purpose other than specific payment of creditors and as otherwise authorized by the lender. This Court finds his firm belief to have been incorrect and finds the testimony of the officer of the lender to be more credible. The lender gave the Company the amount of money that was requested for payroll even though it was aware that the Company was not regularly making the required trust fund tax deposit.

In addition to the lender providing advances from late June through early December, Mr. Olson also advanced the Company funds for operating purposes. From July 16, 1980, through November 21, 1980, Mr. Olson contributed $967,076 to the operations of the Company. These contributions included direct deposits to the operating account, payments to the lender and payments to suppliers directly.

The Company stayed in operation on a limited basis through early December, 1980, when a Chapter 11 bankruptcy case was filed. Although it continued in operation to some extent thereafter, the issues before this Court are limited to the time frame of June 30, 1980, through December 31, 1980. When the bankruptcy was filed in early December, 1980, trust fund taxes in the amount of $5,309.03 were incurred during the last two weeks of December, 1980, and the appropriate deposit was made on December 30, 1980.

Mr. Olson was the president and chief operating officer during all the time in question and was involved in the decision-making process of the Company during all of the time in question. He was actively involved in negotiating with the lender for advances, with marketing the inventory, with attempting to collect accounts receivable, with paying for materials and supplies, with hiring and firing personnel and, finally, was the officer that filed on behalf of the Company a Chapter 11 bankruptcy voluntary petition in December of 1980.

The issues to be determined by this Court are:

1. Whether Mr. Olson was a person required to collect, truthfully account for, and pay over the federal income and FICA taxes withheld from the wages of employees of the Company for the calendar quarters ending June 30, 1980, September 30, 1980, and December 31, 1980?

2. Whether Mr. Olson's failure to collect, truthfully account for and pay over the withheld taxes was willful?

It is undisputed that the Company failed to pay all of the trust fund taxes for the last three quarters of 1980. If a corporate employer, such as the Company, fails to remit trust fund taxes, 26 U.S.C. § 6672 (hereinafter referred to as Section 6672) permits the Government to recover the lost revenue from the corporate personnel responsible for either collecting, truthfully accounting for, or paying over the tax. *Elmore v. United States*, 843 F.2d 1128, 1132 (8th Cir.1988); *Slodov v. United States*, 436 U.S. 238, 250, 98 S.Ct. 1778, 1786, 56 L.Ed.2d 251 (1978); *Hartman v. United States*, 538 F.2d 1336, 1340 (8th Cir.1976). Pursuant to Section 6672, such

individuals are personally liable for a penalty equal to the amount of the delinquent tax. In relevant part, Section 6672 provides:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a)

■ For an officer or employee to be held liable under this section, two requirements must be satisfied: (1) the party assessed must be a person required to collect, truthfully account for and pay over the tax, generally referred to as a "responsible person", and (2) such a person must have wilfully failed to insure that the withholding taxes were paid. *Elmore,* 843 F.2d at 1132; *Kizzier v. United States,* 598 F.2d 1128, 1132 (8th Cir.1979); *Hartman,* 538 F.2d at 1340.

■ The Eighth Circuit Court of Appeals has determined that a corporate officer may be deemed responsible if he has significant but not necessarily exclusive authority concerning corporate decision making and actions where the payment of federal taxes is involved. *Hartman,* 538 F.2d at 1340. The term "willfully" does not connote a bad or evil motive, but rather means a voluntary, conscious and intentional act, such as the payment of other creditors in preference to the United States. *Id.* at 1341; *Emshwiller v. United States,* 565 F.2d 1042, 1044 (8th Cir.1977); *Elmore,* 843 F.2d at 1132.

■ A person who may otherwise be considered responsible does not violate Section 6672 by wilfully using employer funds for purposes other than satisfaction of overdue employment taxes if, "at the time he assumed control there were no funds with which to satisfy the tax obligation and the funds thereafter generated are not di-

rectly traceable to collected taxes referred by that statute." *Slodov,* 436 U.S. at 259–60, 98 S.Ct. at 1791–92; *see Kizzier,* 598 F.2d at 1132–33; *Elmore,* 843 F.2d at 1132.

■ In this case, Mr. Olson was in control at all times. However, he has urged this Court to conclude as a fact that there were no funds available to pay the trust fund taxes because all funds were encumbered and neither the Company nor he were permitted to use encumbered funds to pay the trust fund taxes. This Court rejects the suggested conclusion. The evidence is and the Court has found as a fact that the lender, although having a security interest in all of the personal property of the Company, including receivables, provided to the Company gross payroll amounts whenever payroll was requested. There is no evidence in the record contradicting the testimony of the officer of the lender concerning the amounts made available for payroll. Therefore, the Court concludes that sufficient funds were available to make the trust fund tax payments and that the Company had the authority to make such payments with funds advanced for payroll purposes.

In addition, the Company had available to it funds other than those provided by the lender. Mr. Olson provided the Company with almost one million dollars during the last few months of 1980. Specifically, Mr. Olson delivered a check made payable to Olson Brothers Manufacturing Company (the Company) on November 13, 1980, in the amount of $50,000 and on December 8, 1980, in the amount of $25,000. These checks were made directly payable to the Company and others were deposited directly in the Company bank account. Any funds that went into the operating account of the Company and were not from accounts receivable were available for the payment of the trust fund taxes.

The Court concludes that Mr. Olson is a responsible person under the specific statutory requirements and that his actions with regard to failure to pay trust fund taxes for the quarters ending September 30, 1980, and December 31, 1980, were wilful

as required by the statute and the cases. However, although Mr. Olson is a responsible person for purposes of the assessment levied with regard to the quarter ending June 30, 1980, his actions were not wilful in that he had no knowledge that the taxes had not been paid and actually the taxes had been paid on a timely basis, but for one reason or another the check was not valid. No evidence was presented by the Government contrary to his position that he had no knowledge and he has provided sufficient evidence on the issue to rule in his favor.

Separate journal entry shall be filed.