**In the Matter of Theodore V. OLSON and Sandra Ann Olson, Debtors.**

**The OVERLAND NATIONAL BANK OF GRAND ISLAND, a banking corporation, Plaintiff,**

**v.**

**Theodore V. OLSON, et al., Defendants.**

**Bankruptcy Nos. BK85–1085, A85–181.**

United States Bankruptcy Court, D. Nebraska.

May 30, 1989.

Robert Creager, Berry, Anderson, Creager & Wittstruck, P.C., Lincoln, Neb., for debtors.

Frank Heinisch, Geneva, Neb., and William Needler, Ogallala, Neb., for law firm creditors.

Loren Mark and Tom Carlucci, Tax Div., U.S. Dept. of Justice, Washington, D.C., for the U.S.

Richard Anderl, Kutak, Rock & Campbell, Omaha, Neb., for Prudential Ins. Co. of America.

## MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

This case concerns numerous issues with regard to tax liabilities and lien priorities. Trial of the issues was bifurcated with a memorandum filed on June 3, 1988, concerning some issues and trial on others which concern the extent and priority of liens attaching to a fund of money was tried for three days in June, 1988, and two days in September, 1988. Briefs and written final arguments were ordered. All materials were received by March 1, 1989. Robert Creager of Berry, Anderson, Creager & Wittstruck, P.C., Lincoln, Nebraska, appeared on behalf of the debtors; Frank Heinisch of Geneva, Nebraska, and William Needler of Ogallala, Nebraska, appeared on behalf of Law Firm creditors. Loren Mark and Tom Carlucci of the Tax Division, U.S. Department of Justice, Washington, D.C., appeared on behalf of the United States. Richard Anderl of Kutak, Rock & Campbell, Omaha, Nebraska, appeared on behalf of Prudential Insurance Company of America.

The parties agreed and this Court finds that this matter is a core proceeding under 28 U.S.C. § 157. This memorandum constitutes findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 and Bankr.R. 7052.

This case has been tried in two parts, the first part concerned whether or not debtor, Theodore V. Olson, was a "responsible party" as that term is defined under the Inter-

nal Revenue Code, making him responsible for a 100 percent penalty for his failure to assure that Olson Brothers Manufacturing, Inc., a corporation, paid the Internal Revenue Service "trust fund" taxes. A memorandum on the responsible party portion of the case was filed on June 3, 1988, 101 B.R. 128 (1988).

This memorandum concerns numerous issues regarding the priority of various parties to a fund of money resulting from the 1982 farming operations of Theodore V. Olson and Sandra Olson. Theodore V. Olson and Sandra Olson were debtors in 1982 under a Chapter 11 filing then pending in the United States Bankruptcy Court for the District of Nebraska. The Olsons' bankruptcy filing, No. BK82–379, filed on March 1, 1982, was eventually dismissed.

## Findings of Fact

The Court will make findings of fact which apply to all parties. The Court will then make certain factual and legal findings with regard to each claimant.

## General Findings

This case is before the Court because the debtors, Theodore and Sandra Olson, who were farmers in the Holt County, Nebraska, area, filed a Chapter 11 petition on March 1, 1982. They had several major creditors who objected to Olson farming during the crop season of 1982. However, after extensive litigation in the Bankruptcy Court, the debtors were able to plant, care for and harvest a crop in the farming year 1982. After orders were entered by the Bankruptcy Court authorizing payment from the proceeds of the crop to certain administrative claimants, a fund of money in the approximate amount of $294,000 remained. Numerous parties claimed an interest in that fund. By agreement of all the parties, the fund was placed in an escrow account with the Overland National Bank of Grand Island. Such procedure was approved by the Bankruptcy Court and the Bank was directed by court order to keep possession of the fund until further order.

During the pendency of the 1982 bankruptcy case, the Internal Revenue Service assessed against Theodore V. Olson a one hundred percent penalty under Section 6672 of the Internal Revenue Code. The assessment was the result of an evaluation by the Internal Revenue Service that Mr. Olson was a responsible party with regard to "trust fund taxes" owed by Olson Brothers Manufacturing, Inc., (OBM).

In January of 1984, the Bankruptcy Court dismissed the Chapter 11 case under Section 1112(b). The debtors' lawyers filed a motion to reconsider such dismissal and alleged that it was erroneously entered based upon the facts of the case. In addition, debtors' lawyers alleged that dismissal would prejudice the administrative claimants, including the lawyers, all of whom had fee applications pending or had provided services to the debtor or to the estate for which they should be compensated. The motion specifically alleged that the Court must have overlooked the pending fee requests and that it should reconsider its order to enable the Court to enter a comprehensive order which would preserve fee allowances to the attorneys.

The Bankruptcy Court overruled the motion for reconsideration. Debtors then appealed to the District Court which affirmed.

Following the January dismissal, the Internal Revenue Service on February 6, 1984, filed a "notice of federal tax lien under Internal Revenue laws" with the County Clerk of Holt County, Nebraska, the appropriate office for filing documents to perfect a lien against Theodore V. Olson's property based upon the assessment made, assuming such assessment was valid.

In March of 1984 the lawyers who had represented the debtors in the bankruptcy case obtained a state court judgment against Theodore V. Olson for attorney fees in an amount exceeding $300,000. In June of 1984, the lawyers attempted to execute against the fund held by Overland National Bank of Grand Island. In response to the garnishment, but after the appropriate answer to the garnishment had

been filed, the Bank filed a declaratory judgment action in the state courts against all claimants to the fund. That action was removed to the United States District Court for the District of Nebraska.

In the meantime, a creditor of the Olsons holding mortgages against real estate of the Olsons filed a foreclosure action in state court. The plaintiff in the main foreclosure action obtained an order of appointment of receiver in March of 1984. The receiver took possession of the property and managed it pursuant to state court order. The mortgage holders obtained a judgment of foreclosure and the debtors, rather than appealing the court decision, took the statutory nine-month stay of the order of sale. After the expiration of the state law stay and just prior to the sheriff's sale of the real estate, debtors filed this Chapter 11 petition on May 1, 1985.

During the pendency of this case, the land has been sold. But the proceeds of the sale have not been sufficient to pay the outstanding claim of one of the mortgagees, Prudential Life Insurance Company of America (Prudential).

After the current bankruptcy case was filed, the District Court referred the Overland National Bank case to the Bankruptcy Court. After notice and a hearing, Overland was permitted to pay into the registry of the Clerk of the Bankruptcy Court all funds which it held and it has been excused from this proceeding. The only parties to the proceeding now are the Internal Revenue Service (IRS), Prudential, the lawyers for the Olsons in the first bankruptcy case, and the Olsons as debtor-in-possession.

With that background, the following numbered items are a chronology of the activities during the 1982 case and the "lien perfection" activities following the dismissal of the 1982 case.

1. On October 4, 1978, Theodore V. Olson ("Olson") and Sandra A. Olson executed a $1,000,000 Installment Note (the "Note") in favor of the Prudential Insurance Company of America ("Prudential").

2. On October 4, 1978, the Olsons executed a Mortgage to Prudential (the "Mortgage") which was a first mortgage lien on 1,280 acres of real estate owned by the Olsons (the "Real Estate"). The Mortgage provides that, "the conveyance of the premises together with all the rents, issues and profits ... is made to secure repayment of a loan ... as evidenced by [the Note]...."

3. On March 1, 1982, the Olsons filed a Voluntary Proceeding under Chapter 11: Joint Petition ("Olsons' Petition") in the United States Bankruptcy Court for the District of Nebraska.

4. As of March 1, 1982, the 1981 real estate taxes on the Real Estate in the amount of $5,764.36 were unpaid. The 1980 Nebraska real estate taxes due December 31, 1980 were paid half on May 29, 1981 and the second half on November 11, 1981. The 1981 real estate taxes were due December 31, 1981, and the first half became delinquent May 1, 1982 and the second half became delinquent September 1, 1982.

5. Heinisch & Bryan Law Offices, William L. Needler & Associates, Ltd. and Berry, Anderson, Creager & Wittstruck represented Theodore V. Olson and Sandra A. Olson in connection with their 1982 Chapter 11 proceedings.

6. On August 12, 1982, Prudential filed a Proof of Claim in the Bankruptcy Court asserting its secured claim against Olsons in the amount of $1,140,071.10 plus accruing interest, costs and attorneys' fees.

7. On September 3, 1982, Prudential filed a Motion for adequate protection in the Bankruptcy Court asserting a right to and seeking to sequester the rents, issues and profits of the Real Estate, which it renewed in subsequent pleadings filed on October 15, 1982, January 3, 1983, and February 23, 1983.

8. Olson produced the 1982 corn crop after the filing of the Chapter 11 proceedings, and Olson thereafter sealed the 1982 corn crop under a federal government farm stored feed grain reserve program pursuant to orders of the Bankruptcy Court.

9. The 1982 corn crop was produced on 3,348 irrigated acres on twenty-eight (28) quarters (three quarters were left idle un-

der a government set-aside program) of Holt County, Nebraska, farm ground in which the ownership, first liens and 1982 corn production in bushels computed from weight are as follows:

| Lender | Owner | Production | Percent of total |
|--------|-------|-----------:|-----------------:|
| Hancock | Theodore V. and Sandra | 159,683.741 | 36.37% |
| Hancock | Theodore V. | 82,338.262 | 18.75% |
| Prudential | Theodore V. | 117,982.699 | 26.87% |
| Engler | Theodore V. | 9,055.780 | 2.06% |
| Keidel | Theodore V. | 12,527.985 | 2.85% |
| Lange rental | Theodore V. | 38,478.079 | 8.76% |
| Vincent rental | Theodore V. | 19,031.261 | 4.33% |
| TOTAL | | 439,097.807 | 100.00% |

10. The percentage of the 1982 corn crop produced from the Real Estate subject to the Mortgage held by Prudential was approximately 26.87%.

11. On January 27, 1983, the Bankruptcy Court ordered that, *inter alia*, the liens of all claimants to the 1982 corn crop be transferred to the proceeds of the 1982 corn crop (Interpleaded Fund); the 1982 corn crop proceeds be deposited in escrow with interest and any entity or individual with a claim to the 1982 corn crop proceeds make application for payment by February 25, 1983. Neither the Olsons' Lawyers nor the United States made a claim to the Interpleaded Fund on or before that date.

12. On February 24, 1983, Olsons executed an Escrow Agreement (the Escrow Agreement) with the Overland National Bank of Grand Island (Overland) requesting that Overland act as escrow agent to the 1982 corn crop proceeds. Prudential, O'Neill Production Credit Association (PCA), John Hancock Life Insurance Company were "consenting parties" and signatories to the Escrow Agreement. The Escrow Agreement provided that no distributions could be made, except by order of the Bankruptcy Court or as agreed by Olsons and the consenting parties.

13. On April 13, 1983, Bankruptcy Judge Stageman issued an order relating to claims to the Interpleaded Fund.

14. On May 5, 1983, Prudential filed a Motion to Dismiss Olsons' bankruptcy reorganization case.

15. On December 15, 1983, during the pendency of Theodore V. Olson's first bankruptcy case, the IRS assessed a 100% penalty under Section 6672 of the Internal Revenue Code against Theodore V. Olson.

16. On January 27, 1984, Bankruptcy Judge Stageman granted Prudential's Motion to Dismiss. Judge Stageman's Order dismissing Olsons' bankruptcy case was appealed to the United States District Court for the District of Nebraska and the Order was affirmed. No appeal was taken of the District Court's Order.

17. On February 6, 1984, the United States filed a Notice of Federal Tax Lien with the Register of Deeds of Holt County, Nebraska. At that time, Olson was a resident of Holt County, Atkinson, Nebraska.

18. On February 17, 1984, O'Neill PCA, a junior mortgagee, filed a Petition of Foreclosure and Application for Appointment of Receiver (Foreclosure Action) relating to the Real Estate in the District Court of Holt County, Nebraska. In this Foreclosure Action, a state court receiver was appointed.

19. On February 24, 1984, Prudential filed a Notice of Appearance in the Foreclosure Action.

20. On March 16, 1984, Olsons' Lawyers obtained a judgment against Theodore V. Olson in the District court for Filmore County, Nebraska in the amount of $359,030.33 plus $50.00 in costs and interest at fourteen percent and transferred the judgment to Hall County District court on June 18, 1984. A summons in Garnishment was issued against Overland National Bank on

or about June 20, 1984. No payment has been made on the judgment.

21. On April 2, 1984, Prudential filed its Answer and Cross Petition in the Foreclosure Action.

22. On June 20, 1984, a Decree of Foreclosure was entered in the Foreclosure Action and the Court determined that Prudential held a first mortgage lien on the Real Estate.

23. On July 27, 1984 Overland filed this interpleader action (Overland Interpleader Action) relating to the Interpleaded Fund which action was removed to the United States District Court for the District of Nebraska.

24. On September 20, 1984, Olsons filed an Answer in the Overland Interpleader Action acknowledging that other claimants held a valid claim to the Interpleaded Fund.

25. On October 10, 1984, Prudential filed an Answer and Cross Claim against Olsons in the Overland Interpleader Action affirmatively alleging a superior interest to Olsons in the Interpleader Fund.

26. On May 13, 1985, Theodore and Sandra Olson filed for relief under Chapter 11 of the Bankruptcy Code. Robert Creager represents the debtors in the present Chapter 11 proceedings. Olsons' Lawyers do not represent the debtors in this bankruptcy case.

27. On July 2, 1985, Olsons filed a Notice of Bankruptcy and Automatic Stay requesting the Overland Interpleader Action be stayed until disposition of his Chapter 11 bankruptcy case.

28. On July 8, 1985, the United States District Court for the District of Nebraska transferred the Overland Interpleader Action to the Bankruptcy Court for disposition as an adversary proceeding in Olsons' Chapter 11 bankruptcy case.

29. On July 31, 1985, after Relief From the Automatic Stay was granted, an Order Confirming Sale of four quarter sections from a total of eight quarter sections of Real Estate under the Mortgage held by Prudential was entered by the District Court for Holt County, Nebraska indicating a sale to Prudential in the amount of $368,000.

30. On January 17, 1986, an Order confirming sale of the remaining four quarter sections of the Real Estate under the Mortgage held by Prudential was entered, indicating a sale to Prudential in the amount of $464,000.

31. On November 6, 1986, the United States filed a Stipulation stating that Prudential's interest in the Interpleaded Fund is superior to the United States' claim and to all other claimants' interests in the Interpleaded Fund.

32. On August 21, 1987, Robert Creager filed a Stipulation stating that Prudential's interest in the Interpleaded Fund is superior to Creager's interest in the Interpleaded Fund.

33. The claim of the United States is based on its Federal Tax Lien as perfected by Notice of Federal Tax Lien filed with the Register of Deeds of Holt County, Nebraska on or about February 6, 1984. When the United States filed its Notice of Federal Tax Lien, the Debtor, Theodore V. Olson, was a resident of Holt County, Atkinson, Nebraska, and the Debtor continues to reside in Holt County as of the date of this Order. The Notice of Federal Tax Lien filed by the United States was filed in connection with a federal tax assessment made against Theodore V. Olson. The Internal Revenue Service entered an assessment against Theodore V. Olson in the amount of $184,220.96, exclusive of interest, pursuant to I.R.C. § 6672 (Section 6672 assessment). Such assessment was made in December, 1983, during the original bankruptcy case. The Section 6672 assessment was not made against Sandra Ann Olson.

34. The Section 6672 assessment relates to federal employment withholding taxes and the employees' portion of Federal Insurance Contributions Act (FICA) taxes owed by OBM. These taxes, which were required to be withheld by OBM and remitted to the United States, are referred to as "Trust Fund" taxes. The Trust Fund taxes owed by OBM are for the quarter periods April 1, 1980 through December 31,

1980. The issue of Theodore V. Olson's liability for the Section 6672 assessment has been tried to the Bankruptcy Court and by memorandum filed June 3, 1988, the Court found him to be a responsible person whose failure to require the company to pay the "Trust Fund" taxes was willful.

35. This Court has jurisdiction over the Interpleaded Fund and the competing lien claims of the parties as to those funds.

36. The Interpleaded Fund includes proceeds from a 1982 corn crop produced by Olson on the Real Estate.

37. The United States claims a superior lien interest in all the interpleaded funds remaining after satisfaction of Prudential's secured interest.

38. Prudential claims a superior lien interest in all the interpleaded funds arising from crops raised on the Real Estate.

39. Olsons' Lawyers claim a superior lien interest in all the interpleaded funds.

40. Olsons claim all of the interpleaded funds not otherwise subject to any other claim entitled to priority ahead of their interest.

## Findings Regarding Specific Claims

### A. Claim of Prudential

Prudential maintains that it has a valid claim against the fund because of its mortgage on the Olson property. The Prudential mortgage, as indicated in the agreed statement of facts recited above, contains a "rents and profits" clause. In September of 1982, Prudential filed a motion with the Bankruptcy Court requesting the Court to sequester rents and profits resulting from the use of the real estate upon which Prudential held a mortgage. The Bankruptcy Court denied Prudential's request on April 13, 1983. Prudential did not appeal that denial. Other secured parties had also requested sequestration pursuant to the terms of their mortgages. Their motions were also denied and on appeal to the District Court it was determined that the order denying sequestration of rents and profits was interlocutory in nature and the District Court would not entertain the appeal.

On March 1, 1982, the date the first bankruptcy case was filed, the Prudential mortgage was not in default. All annual payments had been made and the next annual payment was due on April 1, 1982. Taxes had been assessed but were not delinquent until May 1, 1982. The value of the real estate subject to the mortgage was, according to the schedules filed by the debtor, in excess of the debt due to Prudential. Such valuation was supported during this trial by testimony of Mr. Olson which was based on an appraisal he had obtained prior to March 1, 1982.

In this trial, Prudential presented evidence that in May of 1982 an appraisal was completed which determined that the "liquidation value" of the real estate was less than the debt. However, Mr. Shonka, the appraiser, also testified that he did not consider "liquidation value" to be the same as fair market value and he had no opinion of the fair market value in May of 1982 or at any other time. He did, however, testify that land values in 1982 were declining at the approximate rate of one percent per month.

Prior to bankruptcy, since there had been no default, Prudential had not commenced a foreclosure action in the state courts.

In August of 1982 Prudential filed a motion to sequester rents and profits. The Bankruptcy Judge made no findings of fact concerning the value of the real estate subject to the mortgage at the time the motion was filed. Instead, eight months later, the Bankruptcy Judge denied the motion as a matter of law. He determined that the "rents and profits clause" in a mortgage could be invoked outside of bankruptcy but only by a certain procedure and only under certain circumstances. Under Nebraska law, a mortgage holder has a lien upon the "rents and profits" only if a mortgage foreclosure action is started, a request for a receiver is made, a state court makes a determination that the value of the real estate is probably less than the amount of the debt and the state court then appoints the receiver. The lien of the mortgagee attaches to rents and profits from that day forward. *Saline State Bank v. Mahloch,*

834 F.2d 690, 693 (8th Cir.1987). The Bankruptcy Judge determined that since there had been no default prior to bankruptcy and no foreclosure proceeding commenced or receiver appointed prior to bankruptcy, under Nebraska law the mortgagee had no right to the rents and profits and the motion to sequester rents and profits did not perfect any lien in the rents and profits.

■ Subsequent decisions of the United States District Court for the District of Nebraska and of the Eighth Circuit attempt to clarify the law in this area. A district court decision, *In re Anderson,* 50 B.R. 728 (D.Neb.1985), determined that a post-petition motion to sequester rents and profits was appropriate to enable a mortgagee to maintain the equivalent of the rights it had prior to bankruptcy and could enforce in the state court system outside of bankruptcy. Then, the *Saline State Bank v. Mahloch* decision in 1987, 834 F.2d at 694 summarizes the procedure required before a lien is perfected in rents and profits:

> An analysis of Nebraska cases to date clearly demonstrates that it is only upon default that the assignment clause of the security agreement becomes an equitable lien. Thereafter, Nebraska law requires affirmative action on behalf of the lienholder to perfect such lien.

> Perfection of such equitable lien can occur only if the mortgaged property is insufficient to discharge the mortgage debt.

*Mahloch,* 834 F.2d at 692.

The *Mahloch* court was dealing with a set of facts which left no doubt that the land secured by the mortgage was insufficient to pay the debt. It, therefore, had no problem in holding that "Saline did not have a lien until their interest was fully perfected, i.e., by filing a petition to sequester rents and profits. *Id.*

■ In this case, in contrast to the *Mahloch* case, there is a significant dispute about the value of the real estate in August of 1982. The Bankruptcy Judge, in 1982, relying upon Nebraska statutes and case law, made the decision that Prudential was not entitled to sequestration of rents and profits as a matter of law. He made no factual findings concerning the value of the property or the default. Prudential has, in this case, strenuously argued that the *Anderson* and *Mahloch* cases decided in 1985 and 1987 should be considered retroactive to 1982 and that this Court should apply the rule of law determined in those cases to the facts in this case. Assuming, without deciding, that the rule of law eventually articulated by the United States District Court and the Eighth Circuit Court of Appeals concerning this issue would somehow be retroactive to affect the rights of debtors and creditors in a 1982 bankruptcy case that was dismissed in 1984, this Court still finds Prudential's position unpersuasive.

First, the Bankruptcy Judge presiding over the case in 1982 declined to grant the motion sequestering rents and profits. Therefore, whether he was in error or not, Prudential, in that case, did not obtain a lien. The decision of the Bankruptcy Court was not appealed.

Second, there were no factual determinations made concerning the value of the real estate on the date the motion was filed or on the date the decision was filed. Therefore, it is only with the benefit of seven years' of hindsight that this Court could make a determination of the value of the property in August of 1982 or April of 1983.

Third, the case was dismissed in January of 1984. Assuming that Prudential is correct and that the recent federal court determinations of the perfection of a lien post petition by filing a motion to sequester rents and profits are retroactive, and assuming that the land value in 1982 was insufficient to pay the debt, Prudential obtained a lien on the rents and profits in August of 1982 or in April of 1983. When the case was dismissed in January of 1984, it is at least arguable that the post-petition lien granted in that case was dissolved by virtue of Section 349 of the Bankruptcy Code. Section 349(b)(3) states, in pertinent part: "Unless the court, for cause, orders otherwise, a dismissal of a case ... revests the property of the estate in the entity in

which such property was vested immediately before the commencement of the case under this title." Such a revesting could have the effect of setting aside the post-petition lien and leaving Prudential to its state law remedies.

The legislative history of Section 349(b), according to the House and Senate Reports, is that "the basic purpose of the subsection is to undo the bankruptcy case, as far as practicable, to restore all property rights to the position in which they were found at the commencement of the case." H.R.Rep. No. 595, 95th Cong., 1st Sess. 337–38; S.Rep. No. 989, 95th Cong., 2d Sess. 48–49 *reprinted in* 1978 U.S.Code Cong. & Admin. News, pp. 5787, 5835, 6294.

Fourth, there is the legal issue which could be dispositive. Prudential has asked the Court to focus on the real estate aspects of this matter and to assume that it obtained a lien on this fund which represents proceeds of the 1982 corn crop, by moving to sequester "rents and profits." However, an analysis of the factual and legal situation based upon the Nebraska Uniform Commercial Code would result in a decision opposite that desired by Prudential. For example, in August of 1982 the property which Prudential claimed a lien upon was actually a growing crop. Growing crops are personal property under the Uniform Commercial Code in that they are defined as goods. Neb. U.C.C. 9–105(h). A security interest is not enforceable against the debtor, according to the Uniform Commercial Code, and does not attach unless the debtor has signed a security agreement which covers crops growing or to be grown. Neb. U.C.C. 9–203(1)(a).

It seems, therefore, that there is a tension between the rights of a mortgagee claiming a lien on "profits" and the rights of a debtor-in-possession with the powers of a trustee to avoid such lien under Bankruptcy Code Section 544. Outside of bankruptcy, there is authority that when such tension arises between an interest in real estate and an interest in crops or the proceeds of crops, the Uniform Commercial Code is applicable. *United States v. Newcomb*, 682 F.2d 758 (8th Cir.1982).

Finally, although some evidence was presented in this trial that the value of the real estate as of August of 1982 was insufficient to pay the debt, such evidence is unpersuasive. Mr. Shonka, Prudential's appraiser, testified that land values during the period were declining approximately one percent per month. He testifies with the benefit of hindsight. This Court is not convinced that Mr. Shonka's evidence would have been presented to Judge Stageman or would have been convincing to Judge Stageman in August of 1982. This Court does not believe it appropriate to use the benefit of hindsight to reach back to a date in 1982 and make factual findings concerning the value of real estate on such date, for the sole purpose of coming to a legal conclusion at odds with that of the presiding judge in 1982. Evidence from Mr. Olson, which was in the court file in 1982, including Mr. Olson's schedules which were based on a prepetition appraisal and his current testimony convince the Court that in August, 1982, the value, although declining, had not decreased below the debt.

For all of the legal and factual reasons recited above, this Court declines to find that Prudential has any lien interest in the proceeds in the 1982 corn crop.

## B. Claim of the Lawyers

The Olson Lawyers claim an interest in the fund on the theory that during the 1982 case they performed necessary legal services which enabled the debtor to plant, maintain and harvest the 1982 corn crop. It is thus their position that the 1982 corn crop and its proceeds are the result of their efforts and under the Nebraska Attorney Lien Statute, Neb.Rev.Stat. § 7–108 (Reissue 1987), they should be compensated for their services from this fund. That Nebraska statutory section reads as follows:

An attorney has a lien for a general balance of compensation upon any papers of his client which have come into his possession in the course of his professional employment; and upon money in

his hands belonging to his client, and in the hands of the adverse party in an action or proceeding in which the attorney was employed from the time of giving notice of the lien to that party.

During the fall of 1982 the corn crop was harvested and the debtor requested authority to seal the crop pursuant to the government farm program in effect at that time. Judge Stageman granted the authority to participate in the program and granted the ASCS a lien in the 1982 crop in consideration for a crop loan under the government program. The Judge also required that the money from the loan be deposited in an escrow account at interest. That escrow account which was set up by the debtor at Overland National Bank of Grand Island and consented to by Prudential is the source of the funds which are the subject of this litigation.

The escrow agent was independent from any of the parties to this case and, by agreement of the parties and order of the Court, was prohibited from distributing any of the funds unless ordered by the Court or unless all of the parties to the escrow agreed. The Internal Revenue Service was not a party.

The lawyers suggest that as a matter of fact the escrow agent was an adverse party to both the debtor and the lawyers because it was charged with holding funds resulting from the 1982 corn crop and was prohibited from permitting those funds to be distributed without unanimous agreement of the parties or order of the Court. Therefore, according to the lawyers, the various elements necessary for the lawyers to qualify under the Nebraska Attorney Lien Statute were satisfied.

The lawyers also claim an interest in the fund based upon a judgment lien. After the bankruptcy case was dismissed in January of 1984, the lawyers obtained a judgment against the debtor, Theodore V. Olson, for their fees. Following entry of the judgment, the lawyers attempted execution on the fund held by Overland National Bank of Grand Island by a garnishment proceeding. The lawyers thus argue that they have a judgment and a perfected lien

against the fund as a result of following the statutory procedures.

There is no question that the lawyers acted vigorously in both an offensive and a defensive posture on behalf of the debtor/debtor-in-possession during the 1982 case. The Court finds as a fact that the 1982 corn crop would not have been even planted by the debtor-in-possession but for the efforts of the lawyers. Prudential and other creditors fought the debtor at every turn. They also fought the lawyers at every turn. They attempted to get the Bankruptcy Judge to prohibit the planting of the crop, to prohibit the obtaining of secured or unsecured credit to plant and maintain and harvest the crop. They moved to sequester rents and profits and they moved for relief from the automatic stay. They took action in the state courts to replevin the equipment which was necessary for the farming operation. The debtors, because of the legal efforts of the lawyers, were successful in producing a 1982 crop, paying the secured and unsecured suppliers and turning the crop into actual cash soon after harvest.

However, what the lawyers are asking this Court to do is determine that the fees which were incurred in the 1982 case, but never allowed by the Bankruptcy Court are reasonable, appropriate, of benefit to the estate, and allowable in support of a state law attorney lien or judgment.

The lawyers provided legal services to the debtor and were successful in aiding the debtor to stay in existence long enough to produce the 1982 crop. They also helped the debtor to get Court approval for participating in the government grain programs and obtaining a government loan which is the source of the fund. However, no matter how hard they worked and no matter what they did, the lawyers did not obtain either a judgment or a settlement nor did they create a fund to which an attorney lien could attach.

The debtors planted and tended the crops and harvested the crops. The debtors signed the appropriate loan forms with the government entity to obtain loan proceeds which are now the subject of this dispute.

Neither at the time that the 1982 crop was produced nor at the time the loan funds were escrowed nor at the time the case was dismissed did the lawyers have a reasonable expectation that the fund should or could be used as a source of payment of their fees. At the time of harvest and escrow, the lawyer fees had not been allowed to the extent that the lawyers now desire to be paid. The lawyers did not file any claims against the fund at any time during the 1982 bankruptcy case. Upon dismissal of the case, the lawyers requested the Bankruptcy Judge to reconsider the dismissal and protect their fees. The motion to reconsider was lengthy and directly alerted the Bankruptcy Court to the problem the lawyers anticipated concerning their fees if the case was dismissed. They anticipated that there would be no fund available for payment and that all of the work that they had performed during the case would go unpaid because the debtor would have no source of payment. The Bankruptcy Judge overruled the motion to reconsider and the District Court affirmed the dismissal. Neither the Bankruptcy Judge nor the District Court made any provision for attorney fees nor did they acknowledge any lien in favor of the attorneys against property of the estate or this fund in particular.

The Overland National Bank of Grand Island was not an adverse party. It held funds pursuant to Court order, just as the Clerk of the Bankruptcy Court could be ordered to hold funds subject to contested claims. Such Court order does not create an adversarial relationship between the holder of the funds and the parties to the funds. Therefore, the Court concludes as a fact that the lawyers did not create the fund and that the lawyers were not in an adversarial posture with the escrow agent. Therefore, no attorney lien attaches under Nebraska law.

The lawyers then argue that as a matter of equity, their fees should be allowed a lien status against the fund. This Court rejects such argument. The lawyers may have had an administrative claim in the 1982 bankruptcy case. Upon dismissal of the case, their claim for fees simply be-comes an unsecured claim against the debtor who promised the payment. The promising payor was Theodore V. Olson. Lawyers have an unsecured claim against Mr. Olson in the current case.

The lawyers do not have a perfected judgment lien against the fund, first of all because a good portion of the fund is property of Sandra Olson, against whom there is no judgment. Second, the lawyers' attempt to perfect the judgment lien against the fund was unsuccessful under Nebraska law. The garnishee bank answered the garnishment to the effect that it did not know if it held funds of Theodore V. Olson, because of the court-ordered escrow fund, IRS levy and other claimants. The Lawyers did not proceed further under the state statutes, Neb.Rev.Stat. § 25–1056, 25–1011, 25–1026 to 25–1031.01, for a determination of ownership. Instead, the bank filed this action. As a result, no judgment lien attached.

This Court has reviewed the attorney fee itemization of time, expense and services rendered. The Court has not been requested to make a determination of the allowability of the attorney fees as an administrative expense under Sections 327 through 330 of the Bankruptcy Code. The issue before the Court concerning the attorney fees is a result of the dispute between the Internal Revenue Service and the lawyers over the priority of liens, if any. Since the Court finds that the lawyers do not have a lien against the fund, the Court does not need to make any findings concerning the reasonableness of the fees or the benefit to the estate.

## C. Claim of the United States

The United States claims a priority interest in the fund based on federal tax liabilities owed by Theodore V. Olson which were assessed pursuant to Section 6672 of the Internal Revenue Code. In an earlier trial on some of these matters, this Court, assuming the validity and efficacy of the assessment process, found that Mr. Olson was a "responsible person," pursuant to Section 6672 of the Internal Revenue Code

(26 U.S.C. § 6672) with respect to the trust fund liabilities of OBM for the quarter periods ending September 30, 1980, and December 31, 1980. *See* Memorandum Opinion dated June 3, 1988.

The matters before the Court now concern the merits and priority of the respective lien claims, including calculation of the tax liability. The lien status of the claim is based upon an assessment made in 1982 during the pendency of the first Olson bankruptcy case. During the trial, the Court requested the parties to brief the issue of the validity of the assessment which was made during the pendency of the first bankruptcy case. The United States has responded first that this Court has no jurisdiction to consider actions which took place during the 1982 bankruptcy case and which may have violated the automatic stay in that case because that particular case was dismissed and the Court did not retain jurisdiction to consider the effect of matters which occurred during the case. Second, the United States argues that since the case was dismissed, the assessment is still in place and should be recognized by the Court during this bankruptcy case. Third, the United States suggests that the assessment, although perhaps in violation of the automatic stay, is or was voidable during the 1982 case, but was not then and is not now void. Finally, the United States urges this Court to consider the validity of the assessment based upon the equities of the case. That is, no party had raised the issue of the validity of the assessment during the 1982 case and no party raised it during this 1985 bankruptcy case until the Court raised it on its own motion during the trial of these issues. Therefore, argues the United States, the Court should simply determine that the unchallenged status of the assessment makes it valid and provides the United States with a lien against the fund in question.

■ With regard to the first argument made by the United States, this Court believes that the dismissal of the 1982 case does not validate the assessment made during the case in violation of the automatic stay. As discussed earlier in this memorandum, the dismissal of a bankruptcy case puts the parties, to the extent possible, in the same position they were in prior to bankruptcy. Prior to the 1982 bankruptcy petition being filed, the Internal Revenue Service, although it had the right to assess the 6672 penalty, had not performed the assessment. Therefore, the dismissal, rather than validating and continuing the post-petition assessment, could have the opposite effect and put the parties in their pre-petition status, even assuming that an assessment made in violation of the automatic stay is not absolutely void.

The fact that Judge Stageman did not retain jurisdiction to deal with the actions of the Internal Revenue Service in violation of the automatic stay does not impact upon the assessment or its validity.

■ The next question is whether or not the assessment taken or made during the 1982 bankruptcy case in violation of the automatic stay is void or simply voidable and further, if it is voidable, should this Court exercise its equitable powers to ratify or validate the action of the Internal Revenue Service. There is authority for either position. The Bankruptcy Court in the case of *In re Coleman American Cos., Inc.*, 26 B.R. 825 (Bankr.D.Kan.1983) and the Circuit Court concerning the bankruptcy case of *In re Ward*, 837 F.2d 124, 126 (3rd Cir.1988) both make very strong statements that violations of the automatic stay are void. Such position is supported by the editors of the noted commentary 2 *Collier on Bankruptcy*, ¶ 362.03. (15th ed. 1989). *See also In re H & H Beverage Distribution*, 850 F.2d 165 (3rd Cir.1988); *In re Marine Pollution Service, Inc.*, 99 B.R. 210 (Bankr.S.D.N.Y.1989). To the opposite effect are cases such as *In re Oliver*, 38 B.R. 245 (Bankr.D.Minn.1984); *Alegran, Inc., v. Advance Ross Corp.*, 759 F.2d 1421, 1424–1425 (9th Cir.1985); *In re Albany Partners, Ltd.*, 749 F.2d 670, 675–679 (11th Cir.1984); *In re Lee*, 40 B.R. 123, 126–127 (Bankr.E.D.Mich.1984).

This Court believes that it is a better policy determination, considering the administration of bankruptcy cases, to interpret the automatic stay of Section 362 of

the Bankruptcy Code to mean that actions that are taken in violation of the stay are void, as the courts in *Coleman* and *Ward* and *H & H* and *Marine Pollution Services* have determined. If creditors believe that there is a legitimate possibility that their intentional actions post petition in violation of Section 362 may be ratified later by a court "weighing the equities," creditors will be encouraged to take the action and hope for the best result later.

There is no question in this case that the Internal Revenue Service made the Section 6672 assessment against Theodore V. Olson during his bankruptcy case and without requesting relief from the automatic stay. Such assessment is an act against the debtor that could have been commenced before the bankruptcy petition was filed. It is also an act to recover a claim against the debtor that arose before the commencement of the case. In addition, it is an act to create a lien against property of the estate or the debtor. Finally, it is specifically an act to assess a claim against the debtor that arose before the commencement of the case. Each of those types of actions are specifically prohibited by Section 362(a)(1), (4), (5) and (6). To permit such act to eventually be ratified or validated by the Bankruptcy Court either in the original case or in this case, would enable the United States to step ahead of all other creditors with the same pre-petition unsecured type of claim. It seems to this Court that the whole purpose of the automatic stay of Section 362 is to eliminate the "race to the courthouse" and to permit claimants to be treated according to the classification system and priority system incorporated into other provisions of the Bankruptcy Code, as their individual rights exist on the petition date.

■ Assuming the correctness of the position of the United States concerning the void versus voidability issue, the United States has given this court no reason to ratify the assessment which took place in violation of the automatic stay during the 1982 case. It appears that the assessment was made in violation of the automatic stay without any individual in the Internal Revenue Service intending to violate the Bankruptcy Code. However, as Judge Pusateri suggested in the *Coleman* decision, just because the Internal Revenue Service is a large administrative agency with employees in various parts of the nation and computers which operate without regard to the constraints imposed by the bankruptcy system, the court is not compelled to give special treatment to the actions by the Internal Revenue Service. *In re Coleman American*, 26 B.R. at 831.

The United States suggests that the assessment was not challenged in the 1982 case and was not challenged by any party during the 1985 case before this Court raised the issue of its validity. Therefore, the United States argues that it would somehow be prejudiced if this Court found that the assessment was improper and that the United States had no lien against this specific fund. The suggestions of the United States are without merit. If the assessment was made in violation of the automatic stay, it is void.

On the other hand, if the legal standard is not "void" but is "voidability," the United States has given no compelling reason for ratifying an act that the United States took in violation of the federal Bankruptcy Code. All parties to the 1982 case and to the 1985 case should assume or should be permitted to assume that the Bankruptcy Code is the statutory framework within which each of the claimants must operate. To permit the United States, by virtue of the illegal act of the Internal Revenue Service, to obtain a lien against a specific fund of money owned by the debtors to the detriment of all other creditors of the debtor, is simply not fair. If voidability is the legal standard, this Court declines to ratify the act of the Internal Revenue Service and hereby voids such act.

Without a valid assessment, the Internal Revenue Service has no lien and the filing of its lien documents in February of 1984 are of no effect. In conclusion, the Court finds that the Internal Revenue Service does not have a lien against the escrowed fund.

The ownership of the fund is in the debtors because such fund is a result of their efforts in 1982 and the property is their property, now subject to use and disbursement in accordance with the Bankruptcy Code.

It was agreed by the parties and ordered by the Court that the decision rendered in the first part of this case concerning the validity and extent of the penalty imposed upon Theodore V. Olson would not be a final order for appeal purposes until the issue of priority in the fund was decided. With the filing of this opinion, the order of June 3, 1988, and the order in this matter are final and appealable. Since the Court has determined that the United States does not have a valid assessment and, therefore, no lien against the fund, some of the findings in the June 3, 1988, memorandum might be inapplicable. That order was entered on the assumption that the United States had a valid assessment and, therefore, had a valid reason to claim a priority in the fund.

However, other factual and legal issues concerning the right of the Internal Revenue Service to allocate corporate tax payments in a manner beneficial to the Government and adverse to the "responsible party" will now be addressed in this opinion.

Based upon the findings made above, the United States now has a claim against Theodore V. Olson based upon the Internal Revenue Service determination and this Court's finding that Mr. Olson was a responsible party for purposes of Section 6672 of the Bankruptcy Code and that his failure to ensure that the "trust fund" taxes of OBM were timely paid. One of the issues litigated was the amount of the claim of the United States and the validity of the process used by the United States to determine that amount. Prior to the first bankruptcy case filed by Theodore and Sandra Olson, Mr. Olson was the president of OBM. In 1980, OBM had employees and had incurred "trust fund" tax obligations. OBM paid to the Internal Revenue Service certain payments during the first three weeks of July, 1980. It did not make additional payments during the second quarter of 1980. It filed the official government report (Form 941) reflecting payments due and payments made during the second quarter. The report that it filed showed that it had paid to its employees a certain amount of wages during each pay period of the quarter and that during the first three weeks of July, it had deposited with the Internal Revenue Service an amount equivalent to the "trust fund" taxes due plus the matching amount due from the corporation relating to trust fund obligations. When an employer has employees, it is required to withhold from the employees' gross pay a certain amount for employee income taxes and a certain amount for social security and other federal employment taxes. The employer is required to match the amount withheld from the employee for social security and deposit the total with the Government on a regular basis.

The report filed for the third quarter of 1980 (July, August, September, 1980) appears on its face to show that the corporation complied with the law with regard to the first three weeks of the quarter. However, in late 1983 when the Internal Revenue Service was calculating the 6672 penalty to assess against Mr. Olson, it treated all of the payments made during July as if they were made by the employer to cover its matching obligation and none of the payments were made to cover the employee withholding or social security obligations. The effect of this treatment is to increase the penalty for which Mr. Olson is liable as a responsible person under the Internal Revenue Code.

OBM continued to operate outside of bankruptcy until December 10, 1980. From the middle of July until the first of December, 1980, it had employees and paid wages. However, it did not pay any withholding monies to the Internal Revenue Service nor did it pay any trust fund taxes or matching funds to the Internal Revenue Service. On December 1, 1980, the company was without funds to make any payroll payments. Some employees were still at work but all financing for the operations had been shut off by the lender. On December 10, 1980, the company filed Chapter

11 bankruptcy. Theodore V. Olson remained as president and the company operated as debtor-in-possession for a short period of time. During the last two weeks of December, 1980, the company had employees and paid wages for the employees. Mr. Olson personally funded the payroll amounts and the Form 941 which was eventually filed to report on the trust fund and matching payments indicates that during the last two weeks of December of 1980 all employment tax obligations were made by the company to the IRS.

Mr. Olson was removed as president of the company in early January, 1981. A trustee was appointed. The trustee completed the Form 941 and showed on that form that wages were actually paid during the first two weeks of December, 1980, and during the last two weeks of December, 1980, and that the appropriate tax payments were made for the last two weeks. The trustee did not indicate on the form that bankruptcy was filed on December 10, 1980, and did not file a separate Form 941 for the pre-petition and post-petition tax obligations.

In late 1983 when the Internal Revenue Service was determining that Mr. Olson was a responsible party and preparing for the assessment process, it applied the payments made to the Internal Revenue Service after bankruptcy to the pre-bankruptcy non-trust fund obligations of the company for the last quarter of 1980. In other words, it did the same thing with the last quarter as it did with the third quarter and, by so doing, increased the eventual obligation of Mr. Olson for all of the trust fund taxes. However, with regard to the fourth quarter, in addition to simply making the particular application of the payments in a manner favorable to the Internal Revenue Service, it applied taxes paid post petition to pre-petition obligations.

Mr. Olson had no control over the company after the trustee was appointed and had no access to the records and no ability to supervise, prepare, sign or object to the form which was filed by the trustee and which erroneously indicated wages were paid during the first two weeks of Decem-

ber of 1980. Mr. Olson's testimony that no wages were paid during the first two weeks of December, 1980, is unrebutted. It is also consistent with this Court's findings that the lender had shut down the cash flow as of the end of November, 1980. Those findings were made in the memorandum filed June 3, 1988.

Although there is no valid assessment, the United States has filed a claim which is prima facie evidence of its validity. *See* Bankr.R. 3001(f). It is the burden of the taxpayer to go forward with evidence and make a showing contrary to the validity of the claim. It is then the burden of the claimant to convince the Court that its claim is valid. Mr. Olson has met his burden. He has shown that during July of 1980 the company was in compliance with the law and paid all of the taxes it owed, whether trust fund or not, for the first three weeks. He has shown and the United States has not rebutted or presented any contrary evidence, that the company did not make any payroll during the first half of December, 1980. He has shown that the company filed bankruptcy on December 10, 1980, and that he personally loaned the company money to make the payroll for the last half of December, 1980, and to make the tax payments both for trust fund taxes and the company matching taxes.

The United States does not seem to dispute those facts that this Court has just found, but takes the position that even assuming all of those facts are correct, the Internal Revenue Service has a right to apply payments to its advantage to ensure that it will be able to collect trust fund taxes from the responsible person. This is a legal issue and will be discussed in two parts.

First, the analysis must focus upon the validity of the process of applying post-petition tax payments for payroll periods during the last half of December, 1980, to non-trust fund tax obligations of the company incurred prior to December 10, 1980, the bankruptcy petition date. The IRS has presented no evidence and no convincing legal argument that there is any statutory

or case law authority for such application. The bankruptcy trustee filed the quarterly report relied upon by the Government. The report did not break down payroll and taxes paid pre petition from payroll and taxes paid post petition. The IRS, when computing the penalty against Mr. Olson in 1983, paid no attention to the fact that the taxes paid after December 10, 1980, were taxes paid by a debtor-in-possession for post-petition payroll. It treated those tax payments as if they were made by the debtor company outside of bankruptcy and it, therefore, applied the payments as if no bankruptcy had occurred. This process significantly increases the claim of the Government against Theodore V. Olson for the trust fund taxes. This Court finds such a practice to be legally unjustifiable and factually unfair.

■ On December 10, 1980, when the bankruptcy petition was filed for OBM, a new entity came into existence. The Internal Revenue Service had no right to apply tax payments made post petition to pre-petition obligations, trust fund or otherwise. Since it could not do that with regard to the obligations of the company, it, therefore, follows that the taxes paid by the company for the last half of December, 1980, must be recognized by the Internal Revenue Service and applied in the manner in which they were reported. By doing so, the result is that the company owes no trust fund taxes for the post-petition time frame of December 10, 1980, through December 31, 1980. If the company owes no such trust fund taxes, neither does Mr. Olson, because his obligation is solely a function of the obligation of the company for such trust fund taxes.

The Court, therefore, finds that the claim of the United States against Mr. Olson for the amount of trust fund taxes allegedly due for payroll made between December 10, 1980, and December 31, 1980, is not allowed.

The United States has provided no evidence that payroll was actually made during the first ten days of December, 1980. This Court accepts as true the evidence presented by Mr. Olson that no payroll was made during the first ten days of December, 1980, and that the quarterly report filed by the trustee after December 31, 1980, is incorrect. Therefore, that portion of the claim of the United States which assesses trust fund taxes based upon payroll allegedly paid during the first ten days of December, 1980, is found to be invalid and not allowed.

■ The final question concerns the right of the Internal Revenue Service to apply the payments made by the company in July of 1980 to the company matching obligations rather than to the trust fund taxes for that period of the quarter. As legal authority for its application practice, the United States relies upon an Internal Revenue Service manual which was not admitted into evidence. A copy of such a manual is attached to the final argument and brief submitted by the United States.

The Internal Revenue Service recognizes the right of a taxpayer to designate the application of payments to specific tax obligations. However, when no designation is made, the Internal Revenue Service will almost always decide to apply the tax payment to a non-trust fund tax debt first. Revenue Ruling 79–284, 1979–2 C.B. 83, modifying Revenue Ruling 73–305, 1973–2 C.B. 43, superseding Revenue Ruling 58–239, 1958–1 C.B. 94, provides that

> voluntary partial payments of assessed tax, penalty, and interest will be applied to withheld employment taxes and collected excise taxes as designated by the taxpayer. If no designation is made, the payments will be allocated to tax, penalty and interest in a manner serving the best interest of the service.

Based upon this Revenue ruling authority, the Internal Revenue Service manual provides a procedure for determining, in a step-by-step process, how much of the non-designated payment should be applied to non-trust fund taxes and how much of such payment should be applied to trust fund taxes. The United States presented the testimony of two Internal Revenue Service employees explaining the process by which the July payments were applied to the non-trust fund taxes first for the third quarter.

In 1980, OBM did not designate the application of the payments that it made during July of 1980. Therefore, when the Internal Revenue Service was computing the amount of trust fund taxes still owed by OBM, it followed the Revenue ruling cited above and applied the July payments first to the non-trust fund portion of the tax obligations, leaving no money to be applied to the trust fund portion. This procedure has been discussed in several cases concerning the right of a debtor in bankruptcy to allocate tax payments made pursuant to a bankruptcy plan of reorganization to trust fund versus non-trust fund taxes. See *In re DuCharmes & Co.*, 852 F.2d 194 (6th Cir.1988); *In re Technical Knockout Graphics Co., Inc.*, 833 F.2d 797 (9th Cir. 1987); *In re Ribs–R–Us, Inc.*, 828 F.2d 199 (3rd Cir.1987). These three cases ruled that a bankruptcy court could not confirm a plan which authorized the debtor to designate post-petition payments to be applied to certain types of taxes owed for other types of taxes. On the other hand, *In re Energy Resources Co., Inc.*, 871 F.2d 223 (1st Cir.1989) decided that the bankruptcy court did have the power to confirm a plan providing for a designation of payments over the objection of the Internal Revenue Service.

However, each of those cases was dealing specifically with the attempt by a debtor in bankruptcy to override the Internal Revenue Service application policy concerning future payments. In the case before the Court, the Internal Revenue Service, dealing with a corporate debtor not in bankruptcy at the time the taxes became due, has applied payments previously made in a manner consistent with the Revenue Ruling. The company which actually owes the taxes is no longer in existence. It was not in existence in 1983 when the application was made. The party objecting to the application is the "responsible party" under the statute who will be subject to a higher claim by the Internal Revenue Service if the court upholds the application policy than if the court finds the policy to be unwarranted.

After considering the right and obligation of the Internal Revenue Service to collect taxes and to implement procedures beneficial to that collection activity, this Court does not find the procedures followed in this case to be unwarranted or an unreasonable interpretation of its duties. The Internal Revenue Service will be unable to collect trust fund taxes or non-trust fund taxes from OBM. It has no statutory authority to "pierce the corporate veil" and collect the non-trust fund taxes from the responsible officers in the corporation. However, it does have a statutory opportunity to collect the trust fund taxes from the responsible person.

In order to maximize its opportunity for collection of revenues, it has implemented a policy whereby payments made during a quarter are applied in a manner most beneficial to the United States. That means that it first applies payments to the non-trust fund aspects of the obligation of the company in order to maximize that collection process. It then looks to the responsible person for collection of the trust fund taxes. In this case it looks to Theodore V. Olson for collection of those trust fund taxes which accrued during the quarter July 1 through September 30, 1980.

This procedure is not unreasonable and the application of the payments on a quarterly basis rather than on a weekly basis in which they were paid is also not unreasonable. The evidence before the Court is that the weekly or monthly payments are simply deposited in a general account and are not applied to any particular portion of the tax obligation of the company until the quarterly report is filed or until it is determined that there is an inability to collect from the company all of the taxes due by the company.

The Court, therefore, concludes that the application by the Internal Revenue Service of payments made during July of 1980 first to non-trust fund taxes thereby maximizing the amount due from Mr. Olson for trust fund taxes is not unreasonable and the claim of the Internal Revenue Service with regard to such taxes is allowed.

For plan confirmation purposes and claim allowance purposes, the United

States should file an amended claim with specific numbers in conformance with this opinion.

In conclusion, the Court finds that Prudential does not, Olson Lawyers do not, and the United States does not have a lien on the interpleaded fund. The IRS assessment against Theodore V. Olson during his 1982 bankruptcy case is void. The application of taxes paid by OBM after its bankruptcy to non-trust fund prepetition tax obligations is invalid. The application of OBM tax payments in July, 1980, to third quarter non-trust fund taxes is appropriate. The United States may file an amended claim in conformance with this memorandum.

Separate journal entry to be filed.